**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| **ROSAMUND A. WOLFGRAMM,**<br><br>    **Plaintiff,**<br><br>    **v.**<br><br>**COMMUNICATIONS WORKERS OF AMERICA LOCAL 13301,**<br><br>    **Defendants.** | **CIVIL ACTION NO. 19-3701** |

**MEMORANDUM OPINION**

**Rufe, J.**                                                                                   **March 30, 2022**

Plaintiff Rosamund Wolfgramm brings claims against Defendant American Airlines ("American"), Defendant Workforce QA ("WQA"), Defendant Communications Workers of America Local 13301 ("Local 13301") and Defendant Communications Workers of America District 2-13 ("District 2-13" and, together with Local 13301, "CWA"), arising out of each Defendant's respective role in American's termination of Wolfgramm's twenty-year employment. Defendants have each moved to dismiss these claims.

For the reasons explained below: (1) American's motion will be denied; (2) WQA's motion will be granted; and (3) CWA's motion will be granted with respect to Wolfgramm's Title VII and PHRA claims and denied with respect to Wolfgramm's "Duty of Fair Representation" claim under Pennsylvania state law.

## I.   BACKGROUND[1]

Wolfgramm is a woman of Asian-Pacific Islander (specifically Tongan) heritage.[2] Wolfgramm has been diagnosed with Attention Deficit Disorder ("ADD") and anxiety, which she treats with a prescribed medication containing amphetamines, a controlled substance.[3] Wolfgramm disclosed this prescription to her employer, American, "well before" January 2017.[4] Wolfgramm worked for American for more than twenty years—most recently as a Senior Customer Service Representative stationed at the Philadelphia International Airport—until she was terminated on September 11, 2017, after a drug test detected amphetamines in her urine.[5]

### A.  Disability Leave, Return to Work, and Termination

From January through June 2017, Wolfgramm was on paid disability leave.[6] As part of her clearance to return to work, she was required to undergo certain background and security checks and recertification classes.[7] Wolfgramm's position was subject to mandatory drug testing, both under American's policies and under testing and reporting regulations of the United States Department of Transportation ("DOT").[8] On August 18, 2017, Wolfgramm voluntarily provided

---

[1] On a motion to dismiss, the Court accepts the facts alleged in the Second Amended Complaint as true and draws all reasonable inferences in favor of Wolfgramm. *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir.2008).

[2] Second Am. Compl. [Doc. No. 79] ¶¶ 4, 10–12, 60, 92, 109.

[3] Second Am. Compl. [Doc. No. 79] ¶¶ 4, 11, 42, 64.

[4] Second Am. Compl. [Doc. No. 79] ¶ 42.

[5] Second Am. Compl. [Doc. No. 79] ¶¶ 3, 20–21, 130.

[6] Second Am. Compl. [Doc. No. 79] ¶¶ 27–29.

[7] Second Am. Compl. [Doc. No. 79] ¶ 30.

[8] Second Am. Compl. [Doc. No. 79] ¶¶ 13–14, 24–25, 32.

a urine sample for a drug test as part of recertification for her "Ground Service Coordinator" credential.[9]

WQA is a private company, headquartered in Utah, that was contracted by American to perform the functions of a "Medical Review Officer ("MRO")".[10] The duties of an MRO are set forth in DOT regulations, and include administering and evaluating drug tests, as an "independent and impartial 'gatekeeper.'"[11] WQA processed Wolfgramm's urine sample and reported the sample as testing positive for amphetamines.[12]

As required by the DOT regulations, WQA attempted to notify Wolfgramm of the test results by telephone on several occasions. American's company policy prohibited Wolfgramm from using her cell phone.[13] On September 1, 2017, Wolfgramm left on a pre-approved vacation.[14] "[O]n most, if not all, of the dates and times the MRO tried to reach Wolfgramm, she was either at work or on a pre-approved vacation."[15] Wolfgramm was fired on September 11, 2017.[16] Her notification of termination, which she received while on vacation, was the first time she learned of her positive drug test result.[17]

Wolfgramm's summary termination occurred shortly after she filed a discrimination complaint against some of her immediate supervisors. In July 2017, Wolfgramm began to

---

[9] Second Am. Compl. [Doc. No. 79] ¶¶ 30–32.

[10] Second Am. Compl. [Doc. No. 79] ¶ 6.

[11] Second Am. Compl. [Doc. No. 79] ¶¶ 6–7, 14–16.

[12] Second Am. Compl. [Doc. No. 79] ¶¶ 33, 42.

[13] Second Am. Compl. [Doc. No. 79] ¶ 39.

[14] Second Am. Compl. [Doc. No. 79] ¶¶ 46–47.

[15] Second Am. Compl. [Doc. No. 79] ¶ 39.

[16] Second Am. Compl. [Doc. No. 79] ¶¶ 43, 47, 59, 95, 108.

[17] Second Am. Compl. [Doc. No. 79] ¶¶ 46–48.

experience harassment from two of her supervisors, Beth Norton and "Ms. Tobin."[18] Tobin also served as the president of Defendant Local 13301.[19] This harassment was "perceived to be racially motivated and was discriminatory against [Wolfgramm's] disability."[20] Wolfgramm reported this harassment to her human resources office. Wolfgramm "does not know for sure whether these Caucasian supervisors were aware that [Wolfgramm] had made complaints about them, but [she] suspects that they did know because they treated her so unfairly regarding [the] drug test . . . which arose very close in time" to the complaints.[21]

### B.  Post-Termination Union Representation

Wolfgramm is a member of a union, the Communications Workers of America, which negotiated a Collective Bargaining Agreement ("CBA") with American.[22] Defendant Local 13301 is Wolfgramm's local, and Defendant District 2-13 is responsible for providing services to Local 13301.[23] Following her termination, Wolfgramm filed a grievance through the union contesting American's decision and seeking an opportunity to explain the positive drug test.[24]

When she filed her grievance, Wolfgramm told her union representative that she was aware of Caucasian members of Local 13301 who had not been terminated after testing positive for drugs, even though those members did not have medical justification for those test results.[25]

---

[18] Second Am. Compl. [Doc. No. 79] ¶¶ 69, 105

[19] Second Am. Compl. [Doc. No. 79] ¶ 58, 77.

[20] Second Am. Compl. [Doc. No. 79] ¶¶ 105–06.

[21] Second Am. Compl. [Doc. No. 79] ¶¶ 58, 61, 105.

[22] Second Am. Compl. [Doc. No. 79] ¶ 128.

[23] Second Am. Compl. [Doc. No. 79] ¶¶ 7–8.

[24] Second Am. Compl. [Doc. No. 79] ¶ 61.

[25] At the same time, Wolfgramm directly informed American that she believed she was being treated differently than similarly situated Caucasian employees. Second Am. Compl. [Doc. No. 79] ¶¶ 62–63.

However, Wolfgramm felt as though representatives of CWA refused to thoroughly prosecute the grievance.[26] Wolfgramm's union representatives did not allow Wolfgramm to bring her personal counsel to her administrative hearings,[27] refused to argue that Wolfgramm was terminated in retaliation for reporting Norton's harassment, and "did not provide her with the same representation she ha[d] observed the union provide to Caucasian members" of CWA.[28] Wolfgramm attributes this reluctance to the fact that the other supervisor against whom Wolfgramm had filed a discrimination complaint was Tobin, the president of Local 13301.[29]

### C. Procedural History[30]

On January 16, 2018, Plaintiff filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRC"), alleging that AA and the CWA discriminated against her based on her race, age, national origin, and disability and retaliated against her. On August 30, 2018, after exhausting her administrative remedies, Wolfgramm filed suit against CWA in the District of New Jersey. The case was transferred to this District. In September of 2018, Wolfgramm filed a separate action against American and WQA in the Philadelphia Court of Common Pleas, which was removed to this Court. On April 8, 2020, the Court directed Wolfgramm to consolidate her claims into a single complaint (the "Consolidated Amended Complaint"), and on May 7, 2020,

---

[26] Second Am. Compl. [Doc. No. 79] ¶ 61.

[27] Second Am. Compl. [Doc. No. 79] ¶ 130.

[28] Second Am. Compl. [Doc. No. 79] ¶¶ 66, 130.

[29] Second Am. Compl. [Doc. No. 79] ¶ 61.

[30] As the Court assumes the parties' familiarity with the complex procedural history of this case, the Court provides a brief summary for context.

the cases were consolidated under Civil Action No. 19-3701.[31] Throughout this litigation, Wolfgramm was represented by several attorneys.

Defendants moved to dismiss, presenting many of the same arguments contained in the instant motions.[32] Wolfgramm retained her current attorney, Clifford E. Haines, Esq., after the Consolidated Amended Complaint and the associated motions to dismiss were filed. Wolfgramm, in responding to the motions to dismiss, requested leave from the Court to amend her complaint again in light of her changed counsel.[33]

On March 10, 2021, the Court dismissed claims brought under Title VII and the ADA against Defendants American and WQA as time-barred, denied the remainder of Defendants' motions to dismiss without prejudice, and granted Wolfgramm leave to file the Second Amended Complaint.[34] Defendants then moved to dismiss the Second Amended Complaint under Federal Rule of Civil Procedure 12(b)(6).[35] The Court now considers these motions.

## II.   LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[36] The Court must accept as true all factual allegations in the Second

_____

[31] Mem. Op. Mar. 10, 2021 [Doc. No. 77] at 2–3.

[32] *See* Def. American's First Mot. Dismiss [Doc. No. 56]; Def. WQA's First Mot. Dismiss [Doc. No. 60]; CWA Defs.' First Mot. Dismiss [Doc. No. 61].

[33] Pl.'s Resp. Mots. Dismiss [Doc. No. 69] at 5–8.

[34] Order Mar. 10, 2021 [Doc. No. 78].

[35] *See* Def. American's Second Mot. Dismiss [Doc. No. 82]; Def. WQA's Second Mot. Dismiss [Doc. No. 80]; CWA Defs.' Second Mot. Dismiss [Doc. No. 81].

[36] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

Amended Complaint and make all reasonable inferences in favor of Wolfgramm.[37] However, Wolfgramm "must plead more than labels and conclusions," and "[f]actual allegations must be enough to raise the right to relief above the speculative level."[38]

## III.  DISCUSSION

### A.  American

The Second Amended Complaint brings claims against American for discrimination and retaliation under the PHRA,[39] and under 42 U.S.C. § 1981 for discriminatory interference with a contract.[40] American has moved to dismiss each of these claims.[41]

#### 1.  *Disability Discrimination under the PHRA (Count Two)*

American moves for dismissal of Wolfgramm's PHRA disability discrimination claims on two grounds. First, American argues that "Wolfgramm has not plausibly pled that she was

---

[37] Fed. R. Civ. P. 12(b)(6); *McDermott v. Clondalkin Grp., Inc.*, 649 F. App'x 263, 266 (3d. Cir. 2016).

[38] *Twombly*, 550 U.S. at 555.

[39] Second Am. Compl. [Doc. No. 79] ¶¶ 90–111.

[40] Second Am. Compl. [Doc. No. 79] ¶¶ 112–17.

[41] Def. American's Second Mot. Dismiss [Doc. No. 80].

As an initial matter, there is some ambiguity as to what discrimination claims Wolfgramm intends to bring under the PHRA. The heading of Count Two does not specify the type of discrimination that Wolfgramm alleges, and she repeatedly describes several characteristics that are protected by the PHRA (specifically her sex, age, disability, race, and national origin). American addresses each claim in its motion to dismiss, and characterizes Count Two as "asserting race, color, national origin, age and disability discrimination claims." Def. American's Mem. L. Supp. Mot. Dismiss [Doc. No. 82-1] at 2 n.1.

However, Wolfgramm's Response only describes Count Two as asserting disability, race, and national origin claims against American. Pl.'s Omnibus Resp. [Doc. No. 83] at 7–9. The Court agrees with this reading of the Second Amended Complaint; although Wolfgramm notes that she is a woman over forty, she pleads no other facts related to her age or her sex, pleads no facts suggesting age or gender discrimination, and compares her treatment throughout the Complaint to the treatment of Caucasian coworkers of unspecified age or sex, including those "with positive drug test findings that were not otherwise medically justified." Second Am. Compl. [Doc. No. 79] ¶ 62.

In choosing to substantively address only these claims, the Court does not discount the fact that discrimination may result from the intersection of multiple biases. However, Plaintiff only alleges that her termination was influenced by her disability, her race, and her national origin. The Court will not *sua sponte* consider claims that are not presented, especially where Plaintiff is counselled and has already been granted the opportunity to clarify her claims in an amended complaint.

disabled or that American Airlines regarded her as disabled within the meaning of the PHRA."[42]
Second, American argues that, even if Wolfgramm does fall within the protection of the PHRA,
she has not plausibly alleged that American had discriminatory motives when it terminated her
employment.[43]

Under the PHRA, "[t]he term 'handicap or disability' . . . means: (1) a physical or mental
impairment which substantially limits one or more of such person's major life activities; (2) a
record of having such an impairment; or (3) being regarded as having such an impairment."[44]
While "at this early pleading stage" Wolfgramm is not required "to go into particulars about the
life activity affected by her alleged disability or detail the nature of her substantial limitations,"
she must nevertheless plead facts that "plausibly suggest[]" that she was substantially limited in a
major life activity.[45]

Wolfgramm's complaint identifies an impairment—specifically, ADD "and/or"
anxiety—of which American was aware.[46] There are two "limitations" mentioned by
Wolfgramm's complaint: her disability leave between January and June of 2017 "to manage her
medical conditions,"[47] and Wolfgramm's inability to pass a drug test due to her ADD
medication. An inability to pass a drug test due to a prescribed medication is not, by itself, a
substantial limitation of a major life activity, and Wolfgramm does not allege that she was

---

[42] Def. American's Mem. L. Supp. Second Mot. Dismiss [Doc. No. 82-1] at 5–6.

[43] Def. American's Mem. L. Supp. Second Mot. Dismiss [Doc. No. 82-1] at 6–8.

[44] 43 Pa. Stat. Ann. § 954(p).

[45] *Fowler v. UPMC Shadyside*, 578 F.3d 203, 213 (3d Cir. 2009).

[46] Second Am. Compl. [Doc. No. 79] ¶ 4.

[47] Second Am. Compl. [Doc. No. 79] ¶¶ 28–29.

regarded as disabled because she could not pass a drug test.[48] A medical condition that requires six months of paid disability leave, however, could certainly qualify as a disability or a history of disability under the PHRA. Wolfgramm does not allege that this leave was directly connected to her ADD or anxiety, and does not plead that she actually suffered any ongoing substantial limitations to major life activities. However, at this stage of litigation the fact that Wolfgramm had just returned from a six-month paid medical leave raises a reasonable inference that American viewed her as disabled, even without further details.

Further, Wolfgramm plausibly alleges facts that raise an inference of discriminatory intent. While undergoing recertification to return to work following paid medical leave, Wolfgramm alleges that her supervisor, Norton, treated her poorly and conducted unspecified harassment that was "discriminatory against [her] disability."[49] Shortly thereafter, Wolfgramm was fired with no notice by Norton for testing positive for amphetamines. Wolfgramm alleges that this summary firing occurred even though Wolfgramm had been prescribed amphetamines to treat her ADD and anxiety, American knew of this prescription, and American was subject to DOT regulations requiring that she be given an opportunity to respond to the test results. Taken together, these allegations support Wolfgramm's allegations that American fired her with discriminatory intent.

---

[48] *See Warshaw v. Concentra Health Servs.*, 719 F. Supp. 2d 484, 494–96 (E.D. Pa. 2010) ("mere knowledge of plaintiff's ADHD and/or drug test results is insufficient to show that plaintiff was regarded as disabled.").

[49] Second Am. Compl. [Doc. No. 79] ¶ 105. Although Wolfgramm provides no additional detail about the substance of these comments, they contribute to an inference that Norton believed Wolfgramm to be disabled.

2.   *Racial Discrimination under the PHRA and § 1981 (Counts Two and Four)*

American also argues that Wolfgramm has not pled racial discrimination under either the PHRA or § 1981. To assert a claim for employment discrimination under the PHRA, a plaintiff must allege "that: (1) s/he is a member of a protected class; (2) s/he was qualified for the position s/he sought to attain or retain; (3) s/he suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination."[50] 42 U.S.C. § 1981, which is often pled alongside Title VII or PHRA discrimination claims, prohibits discrimination on the basis of race in the "mak[ing] and enforce[ment]" of contracts.[51]

In the context of employment discrimination, PHRA and § 1981 claims are analyzed together, as they are "governed by essentially the same legal standards."[52] However, § 1981 requires plaintiffs to "initially plead . . . that, *but for race*, [they] would not have suffered the loss of a legally protected right."[53] This is a higher causation standard than under the PHRA, which only requires plaintiffs to plead that race was a "motivating" factor in the termination.[54]

_____

[50] *McLintock v. City of Philadelphia*, No. 20-3453, 2022 WL 395995, at *3 (3d Cir. Feb. 9, 2022).

[51] 42 U.S.C. § 1981. As used in this statute, "the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

[52] *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 791 n.8 (3d Cir. 2016).

[53] *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020) (emphasis added).

[54] The PHRA allows plaintiffs to bring claims where their termination was attributable to a combination of legitimate and illegitimate reasons (the so-called "mixed-motive" theory). Plaintiffs often do not specify whether they intend to assert a "mixed-motive" or pure "pretext" theory, as the distinction between these theories rests on the type of proof produced during discovery. The Third Circuit has endorsed this practice, since "identifying the proof before there has been discovery would seem to put the cart before the horse." *Connelly*, 809 F.3d at 788. Thus, at the motion-to-dismiss stage, PHRA pleadings should be analyzed under the lower "motivating factor" standard. *Id.* at 789.

No party disputes that Wolfgramm is a member of a protected class, that she was qualified for the position that she held at American,[55] and that she was terminated from that position.[56] However, American argues that Wolfgramm does not "allege any basis other than her personal speculation that American Airlines' actions were discriminatory."[57]

Wolfgramm "is not required to prove discriminatory intent at the motion to dismiss stage, rather she need only put forth allegations that raise a reasonable expectation that discovery will reveal evidence of [it]."[58] "[F]or purposes of pleading sufficiency, a complaint need not establish a *prima facie* case in order to survive a motion to dismiss."[59] Wolfgramm alleges that, after she returned from medical leave, her supervisor Norton began harassing her and speaking disrespectfully about her disability in a way that Wolfgramm "perceived to be racially motivated."[60] Wolfgramm reported this behavior to human resources, but alleges that the mistreatment continued.[61] When Wolfgramm's urine test returned a positive result shortly after her internal complaint, Norton allegedly fired her without giving her the opportunity to explain that the positive result was due to Wolfgramm's ADD medication.[62] Wolfgramm further alleges

---

[55] The Court notes that Wolfgramm was required to undergo recertification after her six-month medical leave, and that the drug test at issue in this case appears to have been a requirement for that recertification. However, as the refusal of American to accept Wolfgramm's medical explanation for the disputed drug test is exactly the issue in this case, Wolfgramm's failure to pass this test does not demonstrate that she was not qualified to reassume her position at American.

[56] Further, no party disputes that termination is an adverse employment action that that could trigger the protection of the PHRA and § 1981.

[57] Def. American's Mem. L. Supp. Second Mot. Dismiss [Doc. No. 82-1] at 7.

[58] *Bagic v. Univ. of Pittsburgh*, 773 F. App'x 84, 87 (3d Cir. 2019) (quotations omitted).

[59] *Connelly*, 809 F.3d 780 at 788.

[60] Second Am. Compl. [Doc. No. 79] ¶¶ 105–06.

[61] Second Am. Compl. [Doc. No. 79] ¶ 106.

[62] Second Am. Compl. [Doc. No. 79] ¶¶ 56–57, 97.

that Norton regularly gave Caucasian coworkers the opportunity to explain positive drug test results, and summarily fired Wolfgramm despite a mandatory policy that required American to "place[] Wolfgramm on an 'ineligible' list before actually terminating her employment."[63] These allegations raise a reasonable expectation that discovery may reveal evidence that Wolfgramm's termination was the result of intentional racial discrimination by American, and satisfy both the "but for" causation standard under § 1981 and the less stringent "motivating factor" standard under the PHRA.

American argues that Wolfgramm's unnamed Caucasian coworkers are not adequate comparators, since "[c]omparators must be 'similar in all relevant respects,' including reporting to the same supervisor, being subject to the same standards, and having engaged in 'similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'"[64] However, Wolfgramm alleges that "a few Caucasian co-workers" who Wolfgramm "knew or became aware of . . . were permitted to provide documentation to prove that a 'positive' drug test finding was not valid under the circumstances."[65] Wolfgramm further alleges that at least some of those co-workers also reported

---

[63] Second Am. Compl. [Doc. No. 79] ¶ 96.

[64] Def. American's Mem. L. Supp. Mot. Dismiss [Doc. No. 82-1] at 6 (quoting *Henley v. Brandywine Hosp., LLC*, No. CV 18-4520, 2019 WL 3326041, at *10 (E.D. Pa. July 24, 2019)).

To state a *prima facie* employment discrimination case by pointing to the treatment of similarly situated coworkers, "[i]t is the plaintiff's burden to put forth evidence that potential comparators are indeed similarly situated, and the plaintiff's own unsupported statements regarding the comparators' circumstances will not suffice." *Mojica v. Advance Auto Parts, Inc.*, No. CV 15-1418, 2016 WL 107844, at *5 (E.D. Pa. Jan. 11, 2016).

[65] Second Am. Compl. [Doc. No. 79] ¶ 99.

to Norton, and were subject to the same DOT regulations that Wolfgramm was.[66] These

allegations are sufficiently specific to plead that similarly situated comparators exist.[67]

### 3. *Retaliation Under the PHRA (Count Three)*

Count Three of the Second Amended Complaint asserts retaliation claims against

American under the PHRA, alleging that Wolfgramm's termination was, in part, in retaliation for

an internal complaint she filed against Norton and another supervisor.

A PHRA retaliation claim may survive a motion to dismiss if it "pleads sufficient factual

allegations to raise a reasonable expectation that discovery will reveal evidence of the

following elements: (1) [the plaintiff] engaged in conduct protected by [the PHRA]; (2) the

employer took adverse action against her; and (3) a causal link exists between her protected

conduct and the employer's adverse action."[68]

American first argues that Wolfgramm failed to allege a protected activity because

Wolfgramm does not allege that she told human resources "that Norton had harassed her based

on any protected characteristic."[69] Under the PHRA, "[a] plaintiff need only allege

discrimination on the basis of race, color, religion, sex, or national origin to be protected from

---

[66] Second Am. Compl. [Doc. No. 79] ¶ 97.

[67] The Court does not, and cannot, conclude that these unnamed co-workers meet the "similarly situated" requirement in all relevant respects. "[A] determination of whether an individual can satisfy the 'similarly situated' requirement triggers a fact-intensive inquiry based on a whole constellation of factors facing that individual employee." *Monaco v. Am. Gen. Assur. Co.*, 359 F.3d 296, 306 (3d Cir. 2004). For this reason, challenges to purported comparators are difficult to address without a developed record. *See Mojica*, 2016 WL 107844, at *5 (emphasizing that summary judgment was appropriate where a plaintiff failed to identify the names or circumstances of alleged comparators after "ample opportunity to conduct discovery and make a record.").

[68] *Connelly*, 809 F.3d at 789. Although the quoted language in *Connelly* refers to Title VII retaliation claims, the *Connelly* court applied the same test to both Title VII and PHRA retaliation claims. *See also Bangura v. Pennsylvania*, 793 F. App'x 142, 145 (3d Cir. 2019) (applying the same framework to retaliation claims brought under Title VII, the PHRA, and 42 U.S.C. §§ 1981 and 1983).

[69] Def. American's Mem. L. Supp. Mot. Dismiss [Doc. No. 82-1] at 8.

retaliatory discharge."[70] The PHRA protects employees even if the underlying complaint is neither successful nor meritorious.[71] This is a "low bar,"[72] although "a charge alleging 'unspecified civil rights violations,' [is] facially invalid and could not give rise to a . . . claim of retaliation."[73] Although Wolfgramm's descriptions of the specific harassment are vague, the Second Amended Complaint alleges that Wolfgramm submitted an internal complaint in July 2017 about harassment from Norton that she "perceived to be racially motivated."[74]

American also argues that Wolfgramm does not allege that the supervisor knew of the internal complaint before firing her.[75] To plead discriminatory retaliation under the PHRA, a plaintiff must allege that the "retaliating" party knew of the protected activity underlying the alleged retaliation.[76]

The proximity in time between a protected complaint and an employee's termination "may provide an evidentiary basis from which an inference of retaliation can be drawn."[77]

---

[70] *Slagle v. Cnty. of Clarion*, 435 F.3d 262, 268 (3d Cir. 2006).

[71] *Id.*

[72] *Id.*

[73] *Kendall v. Postmaster Gen. of U.S.*, 543 F. App'x 141, 145 (3d Cir. 2013) (summarizing the standard set by *Slagle v. Cnty of Clarion*).

[74] Second Am. Compl. [Doc. No. 79] ¶ 105.

[75] Def. American's Mem. L. Supp. Mot. Dismiss [Doc. No. 82-1] at 9.

[76] *Ambrose v. Twp. of Robinson, Pa.*, 303 F.3d 488, 493 (3d Cir. 2002) ("It is only intuitive that for protected conduct to be a substantial or motiving factor in a decision, the decisionmakers must be aware of the protected conduct.").

[77] "[W]hen only a short period of time separates an aggrieved employee's protected conduct and an adverse employment decision, such temporal proximity may provide an evidentiary basis from which an inference of retaliation can be drawn." *Fasold v. Justice*, 409 F.3d 178, 190 (3d Cir. 2005); *see also Holt v. Pennsylvania*, 683 F. App'x 151, 157 (3d Cir. 2017) ("An employee may establish a causal nexus [supporting a retaliation claim] if he shows 'unusually suggestive' temporal proximity between" a protected complaint and the adverse action).

Proximity in time, by itself, is "ordinarily . . . insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events." *Bishop v. United States Dep't of Agric.*, 725 F. App'x 165, 168 (3d Cir. 2018) (*quoting Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1302 (3d Cir. 1997)). However, other circumstantial evidence "gleaned from the record as a whole," including "a pattern of ongoing antagonism," may support an inference that

Wolfgramm filed the HR complaint against Norton in July and was fired two months later. Although two months is not, by itself, an "unusually suggestive" period of time, Wolfgramm's summary termination for a drug test that could be explained by prescribed medication suggests a retaliatory motive.[78] Wolfgramm alleges that "Norton continued to treat [her] in a discriminatory and disrespectful manner" in the weeks following her complaint.[79] She further alleges that, while she "does not know for sure whether [her supervisors] were aware that [Wolfgramm] had made complaints about them," she "suspects that they did know because they treated her so unfairly regarding [the positive drug test], which arose very close in time" to the complaints.[80] These allegations are sufficient at this stage to allow the claim to proceed to discovery.

### B.  Workforce QA

Wolfgramm alleges that WQA improperly handled Wolfgramm's drug test because of her race and that WQA's employees treated Caucasian employees of American differently than she was treated. Count Five of the Second Amended Complaint brings discriminatory interference with a contract claims under 42 U.S.C. § 1981 against WQA.[81]

In its motion to dismiss, WQA argues as a threshold issue that it cannot be held liable under § 1981 because WQA is not Wolfgramm's employer and had no contractual relationship

---

an adverse employment action was knowingly retaliatory. *Holt v. Pennsylvania*, 683 F. App'x 151, 157 (3d Cir. 2017).

[78] *See Groeber v. Friedman & Schuman, P.C.*, 555 F. App'x 133, 136 (3d Cir. 2014) (collecting cases describing temporal proximity, and noting that "nefarious" adverse activity between a complaint and a firing supports an inference of retaliation).

[79] Second Am. Compl. [Doc. No. 79] ¶ 106.

[80] Second Am. Compl. [Doc. No. 79] ¶ 58.

[81] Second Am. Compl. [Doc. No. 79] ¶¶ 118–26.

with Wolfgramm.[82] WQA points to the Supreme Court's decision in *Domino's Pizza, Inc. v. McDonald*,[83] which WQA claims forecloses § 1981 suits against third parties.[84]

WQA misreads *Domino's Pizza*, in which the Supreme Court held that "Section 1981 offers relief when racial discrimination . . . impairs an existing contractual relationship, so long as the plaintiff has or would have rights under the existing . . . contractual relationship."[85] Here, Wolfgramm alleges the impairment of a contract to which she was a party—her employment contract with American.[86] WQA can be held liable under § 1981 for interfering with an employment contract between two other parties, if such interference is done with discriminatory intent.[87]

However, Wolfgramm fails to plead "an intent to discriminate on the basis of race by the defendant."[88] Wolfgramm alleges only that (1) WQA's employees failed to follow the test

---

[82] *See* WQA's Reply Supp. Second Mot. Dismiss [Doc. No. 85] at 2.

[83] 546 U.S. 470 (2006).

[84] WQA's Second Mot. Dismiss [Doc. No. 80] at 9–10

[85] *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006). The *Domino's Pizza* plaintiff was the sole shareholder of a corporation whose counterpart allegedly breached contracts with the corporation due to racial animus against the shareholder; the Supreme Court held that § 1981 did not give the plaintiff-shareholder standing to sue for harms to *the company's* contractual relationship. *Id.* at 472, 476–80. The Supreme Court noted that the company itself may have been able to assert a § 1981 claim. *Id.* at 473.

[86] WQA's Reply makes much of the fact that Wolfgramm's Response does not address WQA's characterization of *Domino's Pizza. See* WQA's Reply Supp. Second Mot. Dismiss [Doc. No. 85] at 2. Nevertheless, the Court must analyze the legal authority on which WQA relies.

[87] "A third party incurs Section 1981 liability [if they] intentionally interfer[e], on the basis of race, with another's right to make and enforce contracts." *McClease v. R.R. Donnelley & Sons Co.*, 226 F. Supp. 2d 695, 699 (E.D. Pa. 2002); *see also Gross v. R.T. Reynolds, Inc.*, 487 F. App'x 711, 718 (3d Cir. 2012) (to state a claim against a third party under § 1981, a plaintiff "must allege that they blocked [the plaintiff] from creating a contractual relationship with [a] third party, or impaired a contractual relationship that existed between him and a third party."); *Lazard v. All Restore, LLC*, No.19-6040, 2021 WL 1175137, at *9 (E.D. Pa. Mar. 29, 2021) (same); *Myers v. Day & Zimmermann Grp. Inc.*, No.20-5893, 2021 WL 4149149, at *2 (E.D. Pa. Sept. 13, 2021) "[T]hird parties may also incur Section 1981 liability when they intentionally interfere with a plaintiff's contractual or at-will" employment relationship with their employer).

[88] *Pryor v. Nat'l Collegiate Athletic Ass'n.*, 288 F.3d 548, 569 (3d Cir. 2002).

16

verification procedures required by DOT regulations;[89] (2) when making the decision to verify the results of the drug test, the reviewer employed by WQA "would have had . . . information" about Wolfgramm's "gender, race, national origin, or age;"[90] and (3) Caucasian employees did not have their drug test verification procedures mishandled.[91] Wolfgramm does not plead any facts that even hint at a racial animus, let alone suggest that her test was mishandled because of her race. Although Wolfgramm alleges that Caucasian coworkers had their tests handled correctly by WQA, this allegation is too generalized, and asserts nothing more than that WQA complied with DOT regulations as to other employees.[92] In short, Wolfgramm only alleges that her drug test verification procedure was mishandled by WQA and that the unidentified WQA employees who mishandled her drug test verification might have known her race.[93] Wolfgramm has not asserted a plausible claim that WQA mishandled her drug test because of her race.[94]

### C. CWA

Wolfgramm alleges that CWA provided intentionally poor representation and assistance to her throughout her termination.[95] Counts One and Six of the Second Amended Complaint bring claims against CWA for discrimination under Title VII and the PHRA, and breach of CWA's Duty of Fair Representation.

---

[89] Second Am. Compl. [Doc. No. 79] ¶¶ 38–41, 49–53.

[90] Second Am. Compl. [Doc. No. 79] ¶¶ 18–19.

[91] Second Am. Compl. [Doc. No. 79] ¶ 19; 122.

[92] "[E]vidence of disparate treatment, alone, is insufficient to establish discriminatory intent." *Williams v. Pennridge Sch. Dist.*, 782 F. App'x 120, 127 (3d Cir. 2019).

[93] Nothing in Wolfgramm's complaint indicates that she ever personally interacted with a WQA employee. In fact, Wolfgramm specifically alleges that she was not contacted by WQA after taking the drug test. Second Am. Compl. [Doc. No. 79] ¶¶ 38–39.

[94] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

[95] Second Am. Compl. [Doc. No. 79] ¶¶ 74–89.

### 1.     Discrimination under Title VII and the PHRA (Count One)

Title VII and the PHRA prohibit unions "from discriminating on the basis of impermissible considerations" when applying "the terms of its collective bargaining agreement."[96] To state a claim for discriminatory application of a CBA, a plaintiff must assert that (1) "the organization committed a violation of the CBA with respect to the plaintiff;" (2) "the Union permitted that breach to go unrepaired, thus breaching its own duty of fair representation;" and (3) "there was some indication that the Union's actions were motivated by some discriminatory animus."[97] CWA argues that Wolfgramm does not "allege any plausible facts to show that [CWA] acted with any discriminatory motive."[98]

Wolfgramm alleges that CWA failed to thoroughly prosecute Wolfgramm's grievance against American. Wolfgramm attributes this failure to the fact that her July internal complaint identified racially motivated discrimination by Tobin, the president of Local 13301.[99] Wolfgramm claims that her union representative was under Tobin's "guidance and supervision."[100]

Taken as true, these pleadings do not support a claim that CWA's purportedly flawed representation was motivated by discriminatory animus. As in the claim against American, Wolfgramm alleges that she filed an internal complaint against her supervisors, Norton and

_____

[96] *Scott v. Graphic Commc'ns Int'l Union, Loc. 97-B*, 92 F. App'x 896, 903 (3d Cir. 2004) (assessing claims brought against a union under Title VII and the PHRA for failure to grieve against discriminatory denial of maternity leave).

[97] *Yon v. SEPTA*, No. 01-5231, 2003 WL 22597614, at *16 (E.D. Pa. Nov. 4, 2003), *aff'd sub nom. Yon v. Transp. Workers' Union Loc. #234*, 112 F. App'x 869 (3d Cir. 2004).

[98] CWA Defs.' Reply Supp. Mot. Dismiss [Doc. No. 87] at 5–6.

[99] Second Am. Compl. [Doc. No. 79] ¶ 61.

[100] Second Am. Compl. [Doc. No. 79] ¶ 78.

Tobin, and that she suspects that they were aware of the complaint. However, the claim against American alleges that Norton fired her in contravention of the relevant policies and procedures and that similarly-situated Caucasian employees reporting to Norton were not fired.[101] In contrast, Wolfgramm does not allege that Tobin ignored any rules or provisions of the CBA, and only pleads, without elaboration, that "she has observed" CWA providing a different standard of representation to "Caucasian members."[102] Wolfgramm alleges that her union representative was under Tobin's guidance and supervision, but does not claim that Tobin played any role in the processing of Wolfgramm's grievance. Such vague allegations and subjective feelings cannot sustain a claim that CWA acted with discriminatory animus.[103]

### 2. *Duty of Fair Representation (Count Six)*

A union has a duty of "fair representation," which is breached "when it acts in bad faith toward its members, and violates the fiduciary trust created from the principal-agent relationship."[104] Such bad faith is shown when a union "arbitrarily ignores a meritorious grievance or processes it in a perfunctory fashion."[105] CWA argues that the Second Amended

---

[101] Second Am. Compl. [Doc. No. 79] ¶¶ 97, 99.

[102] Second Am. Compl. [Doc. No. 79] ¶ 66. Wolfgramm does not claim, for instance, that the union representative asserted retaliation grievances for these Caucasian CWA members.

[103] *See Groeber v. Friedman & Schuman, P.C.*, 555 F. App'x 133, 135 (3d Cir. 2014) (affirming dismissal of a Title VII claim where plaintiff had only pleaded their subjective belief that race played a role in the positive treatment of white colleagues, without showing that a similarly situated person was treated more favorably than the plaintiff).

[104] *Case v. Hazelton Area Educ. Support Pers. Ass'n (PSEA/NEA)*, 928 A.2d 1154, 1158 (Pa. Commw. Ct. 2007) (citing *Falsetti v. Local Union No. 2026, United Mine Workers of America*, 161 A.2d 882, 895 (Pa. 1960)).

[105] *Int'l Bhd. of Elec. Workers v. Foust*, 442 U.S. 42, 47 (1979) (quotations omitted) (citing *Vaca v. Sipes*, 386 U.S. 171, 190–91 (1967)).

Complaint "fails to allege with any particularity facts from which it may be inferred that the way the Union processed the grievance was arbitrary, discriminatory, or in bad faith."[106]

Wolfgramm alleges almost no details about the union grievance process. She says that "CWA refused to properly grieve and prosecute the grievance,"[107] and vaguely alleges that CWA "manipulated the terms of the CBA, failed to enforce the timelines in the CBA, and fabricated provisions of the CBA and Bylaws to prevent Plaintiff from being properly represented."[108] Wolfgramm does not indicate which terms, timelines, or provisions of the CBA were violated, "fabricated," or "manipulated." However, Wolfgramm does make four specific claims with respect to the substance of her representation. Wolfgramm alleges that (1) she was not allowed to bring her personal counsel to administrative hearings,[109] (2) her union representative refused to argue that Wolfgramm was terminated in retaliation for Wolfgramm's internal complaint,[110] (3) her union representative was unable "to properly articulate the racially motivated manner in which [American] was treating her,"[111] and (4) CWA "did not provide her with the same representation as she has observed the union provide to Caucasian members" of the union.[112]

Except as specifically provided for in a CBA, there is no independent right to counsel in union arbitration proceedings, and federal law generally "disfavors attorney involvement in

---

[106] CWA Defs.' Mem. L. Supp. Mot. Dismiss [Doc. No. 81-2] at 7.

[107] Second Am. Compl. [Doc. No. 79] ¶ 61.

[108] Second Am. Compl. [Doc. No. 79] ¶ 85.

[109] Second Am. Compl. [Doc. No. 79] ¶ 130.

[110] Second Am. Compl. [Doc. No. 79] ¶ 130.

[111] Second Am. Compl. [Doc. No. 79] ¶ 130.

[112] Second Am. Compl. [Doc. No. 79] ¶ 66. In her opposition to the motions to dismiss, Wolfgramm argues that she requested to be represented by a "non-white union representative." Pl.'s Opp. Mots. Dismiss [Doc. No. 83] at 15.

grievance resolution."[113] In addition, a duty of fair representation does not "include[] an obligation to provide [a union member] with [their] first-choice Union representative."[114]

Wolfgramm's remaining allegations, however, are sufficient to move to discovery. "[U]nions have broad discretion in determining which matters to arbitrate, so bad faith is not shown by mere refusal to arbitrate grievances—even those with merit."[115] "[E]ven if a plaintiff's allegations that the union failed to develop certain arguments are well-founded, they constitute mere disagreements over tactics and strategy, not a breach of the duty of fair representation."[116] However, "[a] union's representation . . . must be vigorous enough so that available opportunities to present the grievance are utilized, and sufficiently thorough so that the basic issues are presented in an understandable fashion."[117] Wolfgramm alleges that she was fired in contravention to DOT regulations because of her supervisor's discriminatory animus and in retaliation for internal complaints about that supervisor. This context may be considered necessary to an understanding of "the basic issues" surrounding Wolfgramm's grievance. Although Wolfgramm's allegations with respect to the grievance proceedings are sparse, and "a record showing 'the facts, evidence and arguments made during the grievance procedure'" might

---

[113] *Johnson v. United Steelworkers of Am., Dist. 7, Loc. Union No. 2378-B*, 843 F. Supp. 944, 947 (M.D. Pa.), *aff'd*, 37 F.3d 1487 (3d Cir. 1994) (citing *Castelli v. Douglas Aircraft Co.,* 752 F.2d 1480, 1483 (9th Cir. 1985)); *see also Danao v. ABM Janitorial Servs.*, 142 F. Supp. 3d 363, 373 n.3 (E.D. Pa. 2015) ("had the Union never offered attorney representation to Plaintiff, but opted to pursue the matter through use of union stewards, the Court could not find a breach of duty."). Wolfgramm does not allege that the CBA provided her the right to counsel at administrative hearings.

[114] *Cromwell v. United Steel Workers of Am.*, 423 F. App'x 213, 218 (3d Cir. 2011).

[115] *Plouffe v. Gambone*, No. CIV.A. 11-6390, 2012 WL 2343381, at *11 (E.D. Pa. June 20, 2012), *aff'd sub nom. Plouffe v. Cevallos*, 777 F. App'x 594 (3d Cir. 2019).

[116] *Lopez v. Transp. Workers Union Local 234*, No. 16-05515, 2017 WL 2633468 , *5 (E.D. Pa. June 19, 2017).

[117] *Findley v. Jones Motor Freight, Div. Allegheny Corp.*, 639 F.2d 953, 961 (3d Cir. 1981).

rebut her fair representation claims, at this stage Wolfgramm has sufficiently pled that CWA processed her grievance in an arbitrary and perfunctory manner.[118]

## IV.   CONCLUSION

For the foregoing reasons, American's motion will be denied, WQA's motion will be granted, and CWA's motion will be granted in part and denied in part. Wolfgramm's discrimination claims against WQA under 42 U.S.C. § 1981 and against CWA under Title VII and the PHRA will each be dismissed with prejudice, as Wolfgramm has not pled facts supporting an inference of discriminatory intent with respect to either Defendant. WQA will be dismissed from the case, and Wolfgramm's remaining claims against American and CWA will proceed to discovery.[119] An order will be entered.

---

[118] *Lopez*, 2017 WL 2633468, at *6.

[119] Rule 15 provides that leave to amend should be "freely given," and the Third Circuit Court of Appeals have emphasized that "inadequate complaints should be dismissed without granting leave to amend only if amendment would be inequitable or futile." *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 106 (3d Cir. 2002). The decision of whether to grant or deny leave to amend at this stage falls within the sound discretion of the district court. *Cureton v. Nat'l Collegiate Athletic Ass'n*, 252 F.3d 267, 272 (3d Cir. 2001) (citations omitted).

Wolfgramm has not requested further leave to amend. Wolfgramm has had multiple opportunities to amend her complaint. Further, the Second Amended Complaint was filed with the aid of her current counsel, after the bulk of Defendants' arguments were presented in their initial motions to dismiss the Consolidated Amended Complaint. In fact, Wolfgramm explicitly modified the Second Amended Complaint in response to arguments raised by Defendants in their initial motions to dismiss. *See, e.g.*, Second Am. Compl. [Doc. No. 79] at 21 n.7. Allowing further amendment at this point would be inequitable.