**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ROSAMUND A. WOLFGRAMM**<br>**Plaintiff,**<br>v.<br>**COMMUNICATIONS WORKERS OF**<br>**AMERICA LOCAL 13301,** *et al.*<br>**Defendants.** | **CIVIL ACTION NO. 19-3701** |

<u>**MEMORANDUM OPINION**</u>

**Rufe, J.**                                                          **September 18, 2024**

Plaintiff Rosamund Wolfgramm brings employment discrimination and related claims against Defendant American Airlines ("American"), Defendant Communications Workers of America Local 13301 ("Local 13301"), and Defendant Communications Workers of America District 2-13 ("District 2-13" and, together with Local 13301, "CWA"). American and CWA have separately moved for summary judgment, asserting that there is no legally sufficient evidentiary basis for Wolfgramm to prevail. Plaintiff has opposed these motions. For the reasons explained below, American and CWA's motions will be granted.

## I.   LEGAL STANDARD

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[1] A fact is material if it could affect the outcome of the suit, given the applicable substantive law, and a dispute is genuine if the evidence presented is such that a reasonable jury could return a verdict for the nonmoving party.[2] In evaluating a summary judgment motion, a court "must view the

---

[1] Fed. R. Civ. P. 56(a).

[2] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor.[3] When considering multiple motions for summary judgment filed by both parties, a court must evaluate each party's motion individually.[4]

A court may not weigh the evidence or make credibility determinations at the summary judgment stage.[5] Nevertheless, the party opposing summary judgment must support each essential element of the opposition with concrete evidence in the record.[6] This requirement upholds the "underlying purpose of summary judgment [which] is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense."[7] "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."[8] Therefore, if, after making all reasonable inferences in favor of the non-moving party, the court determines there is no genuine dispute as to any material fact, then summary judgment is appropriate.[9]

---

[3] *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).

[4] *Lawrence v. City of Philadelphia*, 527 F.3d 299, 310 (3d Cir. 2008) (citation omitted).

[5] *Boyle v. Cnty. of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998).

[6] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

[7] *Walden v. Saint Gobain Corp.*, 323 F. Supp. 2d 637, 641 (E.D. Pa. 2004) (citation omitted).

[8] *Anderson*, 477 U.S. at 249–50.

[9] *Wisniewski v. Johns-Manville Corp.*, 812 F.2d 81, 83 (3d Cir. 1987).

II.   **BACKGROUND**[10]

A.   **Relevant Facts**

The parties did not submit a joint stipulation of material facts. Instead, Defendants

submitted "Defendants' Joint Statement of Undisputed Material Facts,"[11] and Plaintiff filed

"Plaintiff's Responses to Defendants' Joint Statement of Undisputed Material Facts,"[12] which

contained Plaintiff's in-line comments admitting or denying certain facts, or alternatively,

admitting that certain deponents "testified to this effect."[13] The Court draws the factual

background from the uncontested portions of Plaintiff's Response to Defendants' Joint

Statement, and treats an admission that a deponent "testified to this effect" as a full admission.

Where the facts are disputed, they are viewed in the light most favorable to Wolfgramm as the

non-moving party to the extent they are supported by evidence.

Wolfgramm is a woman of Pacific Islander heritage from New Zealand,[14] who has been

diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD"), a disability that she treats

with a prescription for Adderall.[15] For twenty years, Wolfgramm was employed by American

Airlines or its predecessor at the Philadelphia International Airport, most recently as a Customer

Service Coordinator.[16] Wolfgramm was a member of a union, CWA.[17] As a Customer Service

Coordinator, Wolfgramm reported to Beth Norton, who was the Managing Director of Customer

---

[10] Much of the factual and procedural background in this case can be found in this Court's Memorandum Opinion regarding the Defendants' prior Motions to Dismiss [Doc. No. 88], at 2–5. The Court will provide a brief summary of prior and subsequent background.

[11] Defs.' Joint Statement of Undisputed Material Facts [Doc. No. 126].

[12] Pl.'s Resp. to Defs.' Joint Statement of Undisputed Material Facts [Doc. No. 132].

[13] Pl.'s Resp. to Defs.' Joint Statement of Undisputed Material Facts [Doc. No. 132].

[14] Pl.'s Resp. to Defs.' Joint Statement of Undisputed Material Facts [Doc. No. 132] at ¶ 4.

[15] Pl.'s Resp. to Defs.' Joint Statement of Undisputed Material Facts [Doc. No. 132] at ¶ 5.

[16] Pl.'s Resp. to Defs.' Joint Statement of Undisputed Material Facts [Doc. No. 132] at ¶ 1.

[17] Pl.'s Resp. to Defs.' Joint Statement of Undisputed Material Facts [Doc. No. 132] at ¶ 2.

Services in Philadelphia during the events that transpired in this case.[18] Wolfgramm was also qualified as a Ground Security Coordinator, which is a safety-sensitive function subject to mandatory drug testing under Department of Transportation ("DOT") regulations.[19]

On December 31, 2016, American Airlines suspended Wolfgramm; this suspension was then converted into a medical disability leave under the Family Medical Leave Act.[20] This leave lasted from December 2016 through Summer 2017.[21] While on leave, Wolfgramm's qualification as a Ground Security Coordinator lapsed, and, upon return to work, Wolfgramm sought to be requalified and as such was required to undergo a DOT-mandated drug test.[22]

Workforce QA is an outside vendor that performs Medical Review Officer ("MRO") functions for American Airlines.[23] Wolfgramm submitted to a drug test on August 18, 2017, and completed a "custody and control form," which notes that the donor may be contacted by the MRO to discuss any prescriptions or over-the-counter medications.[24] On this form, Wolfgramm provided her phone number if the MRO needed to contact her.[25] Wolfgramm's drug test was laboratory positive for amphetamines, which Wolfgramm attributes to the Adderall prescribed to her by her doctor.[26]

---

[18] Pl.'s Resp. to Defs.' Joint Statement of Undisputed Material Facts [Doc. No. 132] at ¶ 6.

[19] Pl.'s Resp. to Defs.' Joint Statement of Undisputed Material Facts [Doc. No. 132] at ¶ 18.

[20] Pl.'s Resp. to Defs.' Joint Statement of Undisputed Material Facts [Doc. No. 132] at ¶ 19.

[21] Pl.'s Resp. to Defs.' Joint Statement of Undisputed Material Facts [Doc. No. 132] at ¶ 21.

[22] Pl.'s Resp. to Defs.' Joint Statement of Undisputed Material Facts [Doc. No. 132] at ¶¶ 23–24.

[23] Pl.'s Resp. to Defs.' Joint Statement of Undisputed Material Facts [Doc. No. 132] at ¶ 10. Workforce QA was originally a party to this litigation but was dismissed by the Court's earlier Memorandum Opinion and Order [Doc. No. 88].

[24] Pl.'s Resp. to Defs.' Joint Statement of Undisputed Material Facts [Doc. No. 132] at ¶¶ 26–27.

[25] Pl.'s Resp. to Defs.' Joint Statement of Undisputed Material Facts [Doc. No. 132] at ¶ 28.

[26] Pl.'s Resp. to Defs.' Joint Statement of Undisputed Material Facts [Doc. No. 132] at ¶ 29.

After receiving the laboratory positive test result,[27] between August 24, 2017, and September 5, 2017, the MRO called Wolfgramm 11 times and left four voicemail messages at the phone number she provided.[28] Wolfgramm did not answer any of these calls or listen to any of these voicemails because it was her practice not to answer phone calls or listen to voicemails from phone numbers that she did not recognize.[29]

Bridget Kerchner was the Manager of American's Drug and Alcohol Programs Department and was American's Designated Employer Representative under 49 C.F.R. § 40 during the events that transpired in this case.[30] Kerchner was located in Texas and testified that she had never interacted with Wolfgramm prior to her termination, and Wolfgramm could not recall whether she had ever spoken with Kerchner.[31] Similarly, Kerchner testified that she did not know Wolfgramm's race or national origin, or that Wolfgramm had a disability at the time of Wolfgramm's termination.[32]

Wolfgramm was at work from August 27 to August 31, 2017, and was on vacation from September 1 to September 10, 2017.[33] The MRO reached out to Kerchner for help in contacting Wolfgramm, and on August 28, 2017, Elizabeth Scarim, who worked in American's Drug and Alcohol Programs Department, sent a text message to Wolfgramm requesting that Wolfgramm

---

[27] "Laboratory positive" refers to when a drug test results first come back as positive. The MRO then conducts a verification interview to determine whether there is a legitimate medical explanation for the positive test, including legally valid prescriptions. *See generally* 49 C.F.R. § 40.135–45. If the MRO is able to determine that a legitimate medical explanation exists, the test result is changed to a "verified negative" and the result is then sent to the employer. 49 C.F.R. § 40137(d). If the MRO is unable to determine a legitimate medical explanation exists, the MRO must verify the test result as a "verified positive" and the result is then sent to the employer. *Id.* The MRO must follow the verification interview process laid out in 49 C.F.R. § 40.135–45.

[28] Pl.'s Resp. to Defs.' Joint Statement of Undisputed Material Facts [Doc. No. 132] at ¶¶ 30–31.

[29] Pl.'s Resp. to Defs.' Joint Statement of Undisputed Material Facts [Doc. No. 132] at ¶ 32.

[30] Pl.'s Resp. to Defs.' Joint Statement of Undisputed Material Facts [Doc. No. 132] at ¶ 7.

[31] Pl.'s Resp. to Defs.' Joint Statement of Undisputed Material Facts [Doc. No. 132] at ¶¶ 7–8.

[32] Pl.'s Resp. to Defs.' Joint Statement of Undisputed Material Facts [Doc. No. 132] at ¶ 9.

[33] Pl.'s Resp. to Defs.' Joint Statement of Undisputed Material Facts [Doc. No. 132] at ¶ 39.

return the MRO's call.[34] Wolfgramm did not read this text as she had a practice of deleting text messages without reading them from numbers she did not know.[35] On August 30, 2017, Kerchner sent an email to Wolfgramm's American email address with the subject line "URGENT ACTION REQUIRED," requesting that Wolfgramm reach out to the MRO regarding her recent drug test.[36] Wolfgramm does not recall receiving this email,[37] though she testified that she checks her work email during her shifts.[38]

On September 5, 2017, the MRO reported Wolfgramm's test result as verified positive for amphetamines.[39] On September 11, 2017, American terminated Wolfgramm, notified her via email, and provided information on American's conditional reinstatement program.[40] Within days of her termination, Wolfgramm spoke with Dr. Suls, an MRO at Workforce QA who told her she had tested positive for amphetamines.[41] On September 18, 2017, a Substance Abuse Professional contacted Wolfgramm and invited her to participate in an evaluation to return to work.[42] Wolfgramm did not meet with the Substance Abuse Professional and refused conditional reinstatement on the advice of counsel.[43]

On or around September 10, 2017, American notified Local 13301 that Wolfgramm's employment had been terminated.[44] The next day, Local 13301 filed a grievance requesting that

[34] Pl.'s Resp. to Defs.' Joint Statement of Undisputed Material Facts [Doc. No. 132] at ¶¶ 34–35.

[35] Pl.'s Resp. to Defs.' Joint Statement of Undisputed Material Facts [Doc. No. 132] at ¶¶ 35–36.

[36] Pl.'s Resp. to Defs.' Joint Statement of Undisputed Material Facts [Doc. No. 132] at ¶ 38.

[37] Pl.'s Resp. to Defs.' Joint Statement of Undisputed Material Facts [Doc. No. 132] at ¶ 37.

[38] Pl.'s Resp. to Defs.' Joint Statement of Undisputed Material Facts [Doc. No. 132] at ¶ 40.

[39] Pl.'s Resp. to Defs.' Joint Statement of Undisputed Material Facts [Doc. No. 132] at ¶ 43.

[40] Pl.'s Resp. to Defs.' Joint Statement of Undisputed Material Facts [Doc. No. 132] at ¶ 51.

[41] Pl.'s Resp. to Defs.' Joint Statement of Undisputed Material Facts [Doc. No. 132] at ¶ 45.

[42] Pl.'s Resp. to Defs.' Joint Statement of Undisputed Material Facts [Doc. No. 132] at ¶ 52.

[43] Pl.'s Resp. to Defs.' Joint Statement of Undisputed Material Facts [Doc. No. 132] at ¶ 53.

[44] Pl.'s Resp. to Defs.' Joint Statement of Undisputed Material Facts [Doc. No. 132] at ¶ 97.

Wolfgramm be reinstated along with reimbursement for all wages lost due to termination.[45] Dennis Eichfeld, who was Executive Vice President of Local 13301 at the time, was assigned to handle the grievance.[46]

A grievance hearing originally scheduled for October 16, 2017, was rescheduled at Wolfgramm's request for November 15, 2017.[47] Wolfgramm's then-counsel, Cheryl Cooper, sent a letter to Eichfeld on November 13, 2017, regarding the November 15, 2017 hearing and other matters.[48] Prior to the hearing, Eichfeld made multiple efforts to meet with Wolfgramm to prepare for the hearing.[49] Wolfgramm, on advice of counsel, did not cooperate with the scheduling of a preparation meeting for the hearing.[50] During this hearing, Eichfeld presented Wolfgramm's case, which included evidence such as a letter from Wolfgramm's physician Dr. Josette Palmer, indicating that Palmer had prescribed Wolfgramm Adderall.[51]

On or about December 11, 2017, Wolfgramm was notified by Eichfeld that American had denied her grievance.[52] Eichfeld filed a request that the grievance be arbitrated.[53] Sometime during March 2018, CWA obtained American's agreement to offer another conditional reinstatement to Wolfgramm in settlement of the grievance, which was conveyed to Wolfgramm, but she again rejected the offer based on counsel's advice.[54]

---

[45] Pl.'s Resp. to Defs.' Joint Statement of Undisputed Material Facts [Doc. No. 132] at ¶ 98.

[46] Pl.'s Resp. to Defs.' Joint Statement of Undisputed Material Facts [Doc. No. 132] at ¶¶ 17, 100.

[47] Pl.'s Resp. to Defs.' Joint Statement of Undisputed Material Facts [Doc. No. 132] at ¶¶ 101, 103–104.

[48] Pl.'s Resp. to Defs.' Joint Statement of Undisputed Material Facts [Doc. No. 132] at ¶ 105.

[49] Pl.'s Resp. to Defs.' Joint Statement of Undisputed Material Facts [Doc. No. 132] at ¶ 109.

[50] Pl.'s Resp. to Defs.' Joint Statement of Undisputed Material Facts [Doc. No. 132] at ¶ 109.

[51] Pl.'s Ex. M [Doc. 130-2].

[52] Pl.'s Resp. to Defs.' Joint Statement of Undisputed Material Facts [Doc. No. 132] at ¶ 110.

[53] Pl.'s Resp. to Defs.' Joint Statement of Undisputed Material Facts [Doc. No. 132] at ¶ 111.

[54] Pl.'s Resp. to Defs.' Joint Statement of Undisputed Material Facts [Doc. No. 132] at ¶¶ 112–113

After reviewing the grievance file, District 2-13 International Staff Representative Pamela Tronsor notified Wolfgramm that District 2-13 had decided not to arbitrate the grievance.[55] This decision was based in part on evidence received from American that the MRO attempted to contact Wolfgramm 11 times to discuss her test results.[56] Wolfgramm unsuccessfully appealed the decision multiple times in accordance with CWA's Internal Appeals Procedures, exhausting Wolfgramm's rights under the CWA Constitution to challenge CWA's decision not to submit the grievance to arbitration.[57]

### B.      Procedural Background

On August 30, 2018, after exhausting her administrative remedies, Wolfgramm filed suit against CWA and related individuals in the District of New Jersey. The case was transferred to this District. On April 8, 2020, the Court directed Wolfgramm to consolidate her claims into a single complaint (the "Consolidated Amended Complaint"), and on May 7, 2020, the cases were consolidated under Civil Action No. 19-3701.[58]

Defendants moved to dismiss and in response, Wolfgramm requested leave from the Court to amend her complaint again.[59] Wolfgramm was granted leave to file the Second Amended Complaint, and Defendants then moved to dismiss the Second Amended Complaint under Federal Rule of Civil Procedure 12(b)(6). On March 30, 2022, this Court entered an order: (1) denying American's motion to dismiss; (2) granting Workforce QA's motion to dismiss; and (3) granting in part and denying in part CWA's motion to dismiss.

---

[55] Pl.'s Resp. to Defs.' Joint Statement of Undisputed Material Facts [Doc. No. 132] at ¶ 114.

[56] Pl.'s Resp. to Defs.' Joint Statement of Undisputed Material Facts [Doc. No. 132] at ¶ 114.

[57] Pl.'s Resp. to Defs.' Joint Statement of Undisputed Material Facts [Doc. No. 132] at ¶¶ 115–19.

[58] Mem. Op. Mar. 10, 2021 [Doc. No. 77] at 2.

[59] Pl.'s Resp. Opp'n Defs.' American and CWA Mots. Dismiss [Doc No. 69] at 5–8.

The remaining claims before the Court on summary judgment are: Wolfgramm's claims against American for discrimination under the PHRA[60] and discriminatory interference with a contract under 42 U.S.C. § 1981;[61] and Wolfgramm's claim against CWA for breach of the duty of fair representation.[62] Fact discovery has been completed.[63]

American and CWA moved separately for summary judgment under Federal Rule of Civil Procedure 56, with both parties also asserting that under Federal Rule of Civil Procedure 11 there is no legally sufficient evidentiary basis for Wolfgramm to prevail.[64] Wolfgramm opposed both motions, and Defendants filed reply memoranda.

## III.   DISCUSSION

### A.   American's Motion

American moves for summary judgment on Wolfgramm's discriminatory termination claims. First, American asserts that "Wolfgramm has no evidence that her protected characteristics motivated American Airlines to terminate her employment."[65] Second, American argues that "[e]ven if Wolfgramm could present a *prima facie* case of discrimination, she can point to no evidence of pretext."[66]

---

[60] Second Am. Compl. [Doc. No. 79] ¶¶ 90–103.

[61] Second Am. Compl. [Doc. No. 79] ¶¶112–17.

[62] Second Am. Compl. [Doc. No. 79] ¶¶ 127–131. At one point, Wolfgramm pursued a claim of retaliation against American, but during subsequent discovery, American presented "unrebutted evidence that the decision to terminate Wolfgramm was made largely by Bridget Kerchner, the head of American's Drug and Alcohol Program in Texas, rather than by Wolfgramm's supervisor, and that the supervisor was unaware of Wolfgramm's complaint." Wolfgramm has since dropped the retaliation claim. *See* Pl.'s Opp'n to American's Mot. Summ. J. [Doc. No. 131] at 21 n.9.

[63] Ord. Granting Mot. Extension Time Nov. 13, 2023 [Doc. No. 120].

[64] *See* Def. American's Mot. Summ. J. [Doc. No. 125]; CWA Defs.' Mot. Summ. J. [Doc. No. 127].

[65] Def. American's Mot. Summ. J. [Doc. No. 125] at 3.

[66] Def. American's Mot. Summ. J. [Doc. No. 125] at 4.

Where, as here, there is no direct evidence of discrimination, the Court applies the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*.[67] To assert a *prima facie* case for discrimination, a plaintiff must allege "that: (1) [she] is a member of a protected class; (2) [she] was qualified for the position s/he sought to attain or retain; (3) [she] suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination."[68] If the plaintiff meets that burden, the burden of production shifts to the defendant "to articulate a legitimate, non-discriminatory reason for the adverse employment action."[69] If the defendant meets that burden, the burden shifts back to the plaintiff "to show that the defendant's proffered reason is merely pretext for intentional discrimination."[70] To make a showing of pretext, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons, or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."[71]

The first three factors of the *prima facie* case are satisfied. There is no dispute that Wolfgramm belongs to a protected class. There is similarly no dispute that Wolfgramm is qualified for her position. Wolfgramm's notice of and subsequent termination constitutes an adverse employment action.[72]

---

[67] *Martinez v. UPMC Susquehanna*, 986 F.3d 261, 266 (3d Cir. 2021) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973)).

[68] *McLintock v. City of Philadelphia*, No. 20-3453, 2022 WL 395995, at *3 (3d Cir. Feb. 9, 2022).

[69] *Id.* (citations omitted).

[70] *Id.* (citations omitted).

[71] *Fuentes v. Perskie*, 32 F. 3d 759, 764 (3d Cir. 1994) (citations omitted).

[72] *Fowler v. AT&T, Inc.*, 19 F. 4th 292, 300-01 (3d Cir. 2021) (holding a notice of termination is an adverse employment action).

Regarding the fourth factor of the *prima facie* case, Wolfgramm argues that at minimum, material issues of fact exist with respect to whether her termination was due to intentional disability discrimination.[73] Wolfgramm, in her opposition to summary judgment, only addresses discrimination on the basis of disability, largely arguing how the MRO should have acted in response to Wolfgramm's verified positive drug test. Wolfgramm assumes, but does not submit any support for the argument, that the MRO is an agent of American. The MRO is not employed by American, and Wolfgramm has not pleaded that American has control over how the MRO conducts the testing and verification process, which is instead guided by DOT regulations.[74] Even if the Court were to assume Wolfgramm had sufficiently pleaded that American had control over the MRO's actions and the MRO was an agent of American, Wolfgramm's arguments still fail.

First, Wolfgramm argues that her ADHD, a mental disability, caused her to not take notice of any of the MRO's phone calls, and therefore it was irrational for the MRO to continue calling Wolfgramm and should have contacted her by a different method. This argument is not sufficient to show a *prima facie* case of disability discrimination. Wolfgramm admits that there was no way that the MRO could have known prior to Wolfgramm's termination that Wolfgramm had a prescription for Adderall.[75] Wolfgramm has also submitted no evidence indicating that the MRO was aware of her disability. Even if the MRO were aware of Wolfgramm's disability, the MRO is required through regulation to contact the employee through the phone number(s) listed on the form the employee filled out during the drug test, and is not permitted to contact the

---

[73] Pl.'s Opp'n American Mot. Summ. J. [Doc. 130] at 9. Wolfgramm, in her opposition to summary judgment, only addresses disability discrimination and not discrimination on the basis of national origin or race. Wolfgramm has previously alleged that her termination was influenced by her race, her disability, and her national origin.

[74] *See generally* 49 CFR § 40.

[75] Pl.'s Resp. to Defs.' Joint Statement of Undisputed Material Facts [Doc. No. 132] at ¶ 42.

employee otherwise.[76] Further, Wolfgramm admits that when she submitted to the drug test, she filled out the custody and control form which specifically notes that the MRO would use the phone number listed on the form to reach out regarding any prescriptions or over-the-counter medications.[77] It would be unreasonable to attribute discrimination to an MRO who did not know about Wolfgramm's disability, who attempted to contact her multiple times using the number she provided them, via the method they are required to use and that she was told they would use if they needed to speak with her about her test results or any prescription drugs she may have taken.

Second, Wolfgramm argues that the MRO should have initiated a stand-down (a form of temporary leave or change of position) of Wolfgramm. Wolfgramm makes no assertion that the MRO not initiating a stand-down was due to discrimination. Further, according to Wolfgramm's own argument—and Wolfgramm fails to show otherwise—the MRO is not required to initiate a stand-down, and the failure to do so does not indicate any form of discriminatory intent.[78]

Third, Wolfgramm alleges discrimination because Kerchner should have used a Philadelphia team member to advise Wolfgramm in person of the need to contact the MRO. This argument also fails. Wolfgramm does not allege that Kerchner not using a Philadelphia team member to advise Wolfgramm in person was due to discrimination. Kerchner testified, and Wolfgramm admits, that Kerchner had never interacted with Wolfgramm prior to issuing the

---

[76] 49 CF § 131(c) ("As the MRO, you or your staff must make reasonable efforts to reach the employee at the day and evening telephone numbers listed on the [custody and control form]."). *Compare* § 131(d)(2)(ii) (permitting the Designated Employee Representative to leave a message via any practical means, including voice mail, e-mail, or letter).

[77] Pl.'s Resp. to Defs.' Joint Statement of Undisputed Material Facts [Doc. No. 132] at ¶¶ 26–28.

[78] Pl.'s Resp. Opp'n American Mot. Summ. J. [Doc. No. 130] at 11 (noting that "once an MRO receives a confirmed positive test result, the MRO *may* request that the employee be removed from duty (or 'stood down') until the drug test verification process can be completed with the employee") (emphasis added).

termination, and Kerchner did not know of Wolfgramm's disability.[79] Moreover, according to the DOT regulations that Kerchner and Scarim were required to follow, Kerchner and Scarim were forbidden from informing anyone else at American that they were seeking to contact Wolfgramm on behalf of the MRO.[80]

Fourth, Wolfgramm argues the MRO and Kercher should have aided Wolfgramm in reopening the verification of her laboratory positive test, and in failing to do so they discriminated against her. The pertinent regulation allows an MRO to change a verified test result if within 60 days of the original verification decision the MRO receives information demonstrating that there is a "legitimate medical explanation" for the presence of drugs in the employee specimen.[81] Wolfgramm fails to show that the failure to aid her in reopening the verification occurred because of discriminatory intent. "The 'central focus' of the *prima facie* case 'is always whether the employer is treating "some people less favorably than others because of their race, color, religion, sex, or national origin.""[82]

Nor does Wolfgramm demonstrate that any of the comparators she identified were assisted with the reverification process after receiving a verified positive drug test. Instead, Wolfgramm admits that she did not know whether any of her four alleged comparators were disabled or whether the comparators participated in the conditional reinstatement program that American offered to Wolfgramm.[83] Wolfgramm also admitted that two of her comparators did

---

[79] Pl.'s Resp. to Defs.' Joint Statement of Undisputed Material Facts [Doc. No. 132] at ¶¶ 8–10.

[80] "As the [Designated Employee Representative], you must not inform anyone else working for the employer that you are seeking to contact the employee on behalf of the MRO." 49 CFR § 40.131(d)(1).

[81] 49 CFR § 40.149(a)(3).

[82] *Sarullo v. U.S. Post Service*, 352 F.3d 789, 798 (3d. Cir. 2003).

[83] *See generally* Pl.'s Resp. to Defs.' Joint Statement of Undisputed Material Facts [Doc. No. 132] at ¶¶ 59–81.

not have a DOT drug test, but rather a reasonable suspicion test for alcohol,[84] that she did not know whether they tested positive for alcohol,[85] and that at least one of those comparators was brought back to work under the same conditional reinstatement program American offered to Wolfgramm.[86] Thus, Wolfgramm has pleaded no facts to show discriminatory intent on American's behalf.

Even if Wolfgramm's arguments were sufficient to prove a *prima facie* case of employment discrimination, she has not established that American's "legitimate, non-discriminatory reason for the adverse employment action," is merely "pretext for intentional discrimination."[87] American argues, and Wolfgramm admits, that there is a legitimate non-discriminatory reason for the drug test which was the basis of Wolfgramm's termination: DOT regulations required her to submit to a drug test in order to be re-certified for a safety-sensitive position.[88] American additionally argues that once the MRO verified the test as positive, it "set in motion an automatic termination initiated by the Drug and Alcohol Department and no one involved knew Wolfgramm's race, national origin, or disability status."[89] Kerchner, who drafted the termination letter, did not know of Wolfgramm's protected status at the time of issuing the letter, and only learned of it following her termination.[90]

---

[84] Pl.'s Resp. to Defs.' Joint Statement of Undisputed Material Facts [Doc. No. 132] at ¶¶ 71, 76.

[85] Pl.'s Resp. to Defs.' Joint Statement of Undisputed Material Facts [Doc. No. 132] at ¶¶ 72, 77.

[86] Pl.'s Resp. to Defs.' Joint Statement of Undisputed Material Facts [Doc. No. 132] at ¶¶ 73, 78.

[87] *McLintock v. City of Philadelphia*, 2022 WL 395995, at *3 (3d Cir. Feb. 9, 2022).

[88] Pl.'s Resp. to Defs.' Joint Statement of Undisputed Material Facts [Doc. No. 132] at ¶ 25

[89] American Mot. Summ. J. [Doc. No. 125] at 3. Wolfgramm admits that Kerchner, who initiated the automatic termination under American's Drug and Alcohol Policy, had never interacted with Wolfgramm before her termination and did not know Wolfgramm's race or national origin, or that Wolfgramm had ADHD. *See* Pl.'s Resp. to Defs.' Joint Statement of Undisputed Material Facts [Doc. No. 132] at ¶¶ 8–9.

[90] Pl.'s Resp. to Defs.' Joint Statement of Undisputed Material Facts [Doc. No. 132] at ¶¶ 8–9.

Finally, American argues that it repeatedly offered Wolfgramm conditional reinstatement on the same terms as others who had a first-time verified positive drug test, and Wolfgramm refused those offers.[91] While Wolfgramm argues that she rejected the conditional reinstatement because she instead wanted to have the drug test reopened and verified as negative due to a legitimate medical explanation, she makes no assertion that the failure to do so was due to intentional discrimination on behalf of American or the MROs.

In opposing American's motion for summary judgment, Wolfgramm has relied entirely on "bare assertions, conclusory allegations, [and] suspicions,"[92] and makes no concrete argument that American discriminated against her when it terminated her following her verified positive drug test. As such, Wolfgramm's discrimination claims against American cannot survive summary judgment.

### B.   CWA's Motion

The CWA argues that Wolfgramm's claim for breach of the duty of fair representation fails for two reasons: (1) Wolfgramm has not submitted sufficient evidence supporting her breach of the duty of fair representation claim; and (2) Wolfgramm's claim is untimely.[93]

A union has a duty of "fair representation," which is breached "when it acts in bad faith towards its members, and violates the fiduciary trust created from the principal-agent

---

[91] Pl.'s Resp. to Defs.' Joint Statement of Undisputed Material Facts [Doc. No. 132] at ¶¶ 3–4.

[92] *Fireman's Ins. Co. of Newark, N.J. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982).

[93] CWA Mot. Summ. J. [Doc. 127] at 1. It is not clear from the record and administrative history of this case whether CWA had notice of Wolfgramm's duty of fair representation claim prior to her filing of the Consolidated Amended Complaint [Doc. No. 48]. Because the Court is granting summary judgment on the merits of Wolfgramm's duty of fair representation claim, the Court does not need to address whether it is timely or not.

relationship."[94] Such bad faith is shown when a union "arbitrarily ignores a meritorious grievance or processes it in a perfunctory fashion."[95]

Wolfgramm argues in her opposition to summary judgment that the CWA failed to investigate her grievance because the CWA failed to avail itself of information from Wolfgramm's counsel, or from American.[96] The Court has already noted in this case that "federal law generally 'disfavors attorney involvement in grievance resolution,'"[97] and did not find the argument sufficient to move to discovery. The Court did find the following allegations relating to the substance of her representation by CWA sufficient to survive a motion to dismiss: (1) her union representative refused to argue that Wolfgramm was terminated in retaliation for Wolfgramm's internal complaint, (2) her union representative was unable to properly articulate the racially-motivated manner in which American was treating her, and (3) the CWA "did not provide her with the same representation as she has observed the union provide to Caucasian members" of the union.[98] At summary judgment, however, Wolfgramm has not produced evidence from which a reasonable factfinder could conclude that CWA acted in any of the above-described manners.

Wolfgramm now argues in her opposition to summary judgment solely that material issues of fact remain regarding whether the duty of fair representation was breached because the

---

[94] *Case v. Hazelton Area Educ. Support Pers. Ass'n (PSEA/NEA)*, 928 A.2d 1154, 1158 (Pa. Commw. Ct. 2007) (citing *Falseti v. Local Union No. 2026, United Mine Workers of American*, 161 A.2d 882, 895 (Pa. 1960)).

[95] *Int'l Bhd. of Elec. Workers v. Foust*, 442 U.S. 42, 47 (1979) (quotations omitted) (citing *Vaca v. Sipes*, 386 U.S. 171, 190-91 (1967)).

[96] Pl.'s Resp. Opp'n to CWA Mot. Summ. J. [Doc.131] at 11-12. Much of Wolfgramm's arguments against CWA's motion for summary judgment additionally allege what American or the MRO should have done, which the Court will not address.

[97] Mem. Op. Mar. 30, 2022 [Doc. No. 88] at 20–21 (citing *Johnson v. United Steelworkers of Am. Dist. 7, Loc. Union No. 2378-B*, 843 F. Supp. 944, 947 (M.D. Pa.), *aff'd*, 37 F.3d 1487 (3d Cir. 1994)).

[98] Mem. Op. Mar. 30, 2022 [Doc. No. 88] at 20.

16

CWA failed to properly investigate her grievance or communicate with Wolfgramm's counsel, and because the failure to refer Wolfgramm's grievance to arbitration was arbitrary. The failure to refer Wolfgramm's grievance to arbitration is a new argument, which the Court will not consider as a new claim cannot be raised at the summary judgment phase.[99]

Wolfgramm argues that Eichfeld "performed little to no investigation" in preparation for the grievance hearing, including not meeting with Wolfgramm to prepare for the hearing.[100] Wolfgramm's argument rests almost entirely on the assertion that Eichfeld did not obtain documents from Wolfgramm, her attorney, or American in preparation for the hearing. Even if this is correct, these allegations are not sufficient to constitute breach of the duty of representation.

Lay union representatives cannot be expected to reach the same advocacy and investigative standards as attorneys. "[T]o hold lay union representatives to the demanding tests applied to a trained trial lawyer would defeat the aims of informality and speedy resolution contemplated by labor-management grievance agreements."[101] Further, a union's actions can only be considered arbitrary if "in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness.'"[102]

---

[99] Under Federal Rule of Civil Procedure 8, a complaint must provide a defendant with "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 499 n.1 (3d Cir. 1997). "Although a complaint's allegations are to be construed favorably to the pleader, we will not read causes of action into a complaint when they are not present." *Id.* Wolfgramm's Second Amended Complaint makes no mention of CWA's failure to refer Wolfgramm's claim to arbitration, and the argument has been raised for the first time in Wolfgramm's Opposition to CWA's Motion for Summary Judgment. CWA was not placed on fair notice of this argument and therefore the Court will not consider it.

[100] Pl.'s Resp. Opp. CWA Mot. S.J. [Doc. 131] at 11–12.

[101] *Findley v. Jones Motor Freight, Division Allegheny Corp.*, 639 F.2d 953, 958 (3d Cir. 1981).

[102] *Air Line Pilots Ass'n, Intern. v. O'Neill*, 499 U.S. 65, 67 (1991).

Wolfgramm and her attorney, through multiple letters, appraised Eichfeld of the arguments they had against American. Eichfeld used these arguments at the grievance hearing. Wolfgramm's position was, at the time of the grievance process, that the MRO never gave her the opportunity to provide a legitimate medical explanation. As this was later found to be inaccurate, any investigation Eichfeld could have conducted would have been unhelpful to Wolfgramm. Further, CWA argues, and Wolfgramm admits, that Wolfgramm and her counsel refused to cooperate with CWA's investigation of the grievance, hindering Eichfeld's ability to argue Wolfgramm's case.

Finally, Wolfgramm argues that CWA knew or should have known that Wolfgramm was disabled and her laboratory positive test was due to her prescription Adderall, and that CWA should have either apprised Wolfgramm of the period to reverify her drug test as negative or should have put Wolfgramm in contact with the MRO. Wolfgramm does not cite any evidence to show that the CWA was aware of her disability at this time, as Wolfgramm's primary argument at the time of the grievance when the 60-day period was still open was that the MRO had not contacted her. Wolfgramm also does not cite any authority to support her argument that a lay representative breaches the duty of fair representation when they do not understand every intricacy of the federal regulations relating the airport workers, especially that part of the regulation that applies specifically to the MRO's responsibilities. Viewing the facts in the light most favorable to Wolfgramm, CWA at most was negligent in failing to inform Wolfgramm of her ability to contact the MRO and have her test reverified. But mere negligence is not a violation of the duty of fair representation.[103] Wolfgramm has not shown that CWA or Eichfeld

---

[103] *Riley v. Letter Carriers Local*, 668 F.2d 224, 228 (3d Cir. 1981).

processed her grievance in a "perfunctory manner." Summary judgment will be granted on the duty of fair representation claim.

**IV.    CONCLUSION**

For the reasons stated above, Defendants' motions for summary judgment will be granted. An order will be entered.